**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DANIEL RUSSELL ANDREWS, SR.,      )
                                  )
                 Plaintiff,       )        Case No. 2:19-cv-1443
                                  )
        v.                        )        Magistrate Judge Patricia L. Dodge
                                  )
UNIT MANAGER BEHR, CO1 PELUS,     )
CO2 REID, CO3 LIPENFIELD,         )
CO4 SHEEDER, HIEDE and            )
PAULA PRICE,                      )
                                  )
                 Defendants.      )

## **MEMORANDUM OPINION**[1]

Pending before the Court is Defendants' Motion for Summary Judgment. (ECF 172.)[2] For

the reasons that follow, the Court will deny the motion in part and grant it in part.

## I.      **Relevant Procedural Background**

Plaintiff, Daniel Russell Andrews, Sr., is a state prisoner in the custody of the Pennsylvania

Department of Corrections ("DOC"). He is proceeding pro se in this civil rights action in which

he brings constitutional tort claims against each defendant under 42 U.S.C. § 1983.

The events in question in this lawsuit stem from an incident that occurred when the DOC

housed Andrews at SCI Pine Grove. In the verified Amended Complaint (ECF 74), Andrews

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. (ECF 64, 82, 204.) Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

[2] Although Andrews filed a document titled motion for summary judgment (ECF 169), a review of his relevant filings (ECF 158, ECF 170, ECF 184, ECF 185 and ECF 186) shows that he is not seeking summary judgment. Rather, these filings represent Andrews' opposition to Defendants' efforts to obtain summary judgment and the Court considers them as such. Indeed, Andrews' position is that "[t]here are genuine issues as to material facts regarding all claims [he] has raised in this action[,]" and that his case should proceed to trial. (ECF 184 at p. 3, ¶ 12.)

alleged that in November 2017, his cellmate, Troy Nelson, violently attacked him, resulting in various injuries. After the incident, Andrews was separated from Nelson and assigned a cell in SCI Pine Grove's Restricted Housing Unit ("RHU") in Administrative Custody ("AC") until the Office of Prison Management ("OPM") approved his transfer to SCI Huntingdon. He was moved there on February 28, 2018.

The Amended Complaint named as defendants fourteen individuals and Correct Care Solutions (now known as Well Path). The Court disposed of the former and current defendants' motions to dismiss (ECF 99, ECF 138) as well as a motion for summary judgment filed by former defendant Traci Parkes (ECF 115).[3] The following individuals (collectively, "Defendants") remain in this lawsuit: (1) Unit Manager Behr; (2) Corrections Officer Pelus; (3) Sergeant Reid; (4) Lieutenant Lipenfield; (5) Captain Sheeder; (6) Deputy Heide; and (7) Paula Price, a health care administrator. Behr, Pelus, Reid, Lipenfield, Sheeder and Heide worked at SCI Pine Grove during the events in question in this lawsuit. Price worked at SCI Huntingdon.

The remaining claims in this case, for which Andrews seeks an award of monetary damages, are:

- Eighth Amendment claims against Pelus, Behr and Reid for failing to protect Andrews from Nelson's November 2017 assault. (ECF 74 at pp. 3-4, 8.)

- First Amendment claim that Heide, who was a member Andrews' Program Review Committee ("PRC") at SCI Pine Grove, unnecessarily delayed Andrews' transfer out of SCI Pine Grove's RHU to another facility in retaliation for Andrews filing a grievance against the PRC on January 5, 2018. (*Id.* at pp. 5, 8.)

---

[3] Parkes was the only individual defendant named in the Amended Complaint who was represented by separate counsel. She moved for summary judgment on the claim Andrews brought against her. (ECF 115.) Andrews did not oppose or otherwise respond to Parkes' motion, which the Court granted. (ECF 156, ECF 171.)

- First Amendment claims that on February 13, 2018, Sheeder and Lipenfield retaliated against Andrews for refusing to withdraw a grievance by arranging a scenario in which Andrews would receive a misconduct. (ECF 138 at pp. 3-6.)[4]

- Eighth Amendment claim against Price for denying Andrews a CT scan and an MRI ordered by PA Barbara Buckley and/or Dr. Delbianco when he was housed at SCI Huntingdon. (ECF 74 at p. 7.)

After the close of discovery, Defendants moved for summary judgment (ECF 172), which is fully briefed. (ECF 158, 170, 173-75, 179, 184-86, 188, 190.)

Defendants contend that they are entitled to judgment in their favor for several reasons, including that Andrews failed to exhaust his administrative remedies for each of his claims. (ECF 173 at pp. 6-8; ECF 188.) Andrews counters that the administrative remedy process was unavailable to him and therefore the Court must reject Defendants' failure-to-exhaust defense. (ECF 185 at p. 4; ECF 186 at pp. 5-9.)

---

[4]Andrews originally alleged that Sheeder retaliated against him on February 13, 2018 by threatening Andrews that he would stay in the RHU longer if he did not withdraw a grievance. (Amend. Compl., ECF 74 at p. 6; *see also* ECF 99 at pp. 7-8.) The Court dismissed this claim because "verbal threats alone typically do not constitute adverse action for the purposes of establishing a prima facie retaliation claim." (ECF 99 at pp. 16-17; ECF 109.)

Andrews also originally alleged that after he refused Sheeder's request to withdraw the grievance on February 13, 2018, Lipenfield participated in a separate incident in which Andrews received a misconduct for refusing to accept a cellmate. (Amend. Compl., ECF 74 at p. 6.) The Court dismissed this claim because the allegations of the Amended Complaint did not establish a causal connection between Andrews' refusal to withdraw the grievance and the misconduct that he received later that day. That is, Andrews did not allege, and there was no reason to infer, that Lipenfield knew that Andrews refused to withdraw a grievance before the events that led to the issuance of the misconduct. (ECF 99 at pp. 17-18; ECF 109.)

After the Court issued its initial order on the DOC Defendants' motion to dismiss, Andrews submitted additional filings that supplemented and clarified his retaliation claims against Sheeder and Lipenfield (whom Andrews now alleges attended the meeting at which he claims Sheeder threatened him). (ECF 105, pp. 4-8; ECF 136.) After considering Andrews' supplemental filings, the Court amended its prior order to reflect that the DOC Defendants' motion to dismiss was denied with respect to the retaliation claims asserted against Sheeder and Lipenfield. (ECF 138.) The Court held that Andrews could proceed with retaliation claims against Sheeder and Lipenfield for their alleged involvement in arranging the scenario that Andrews would receive a misconduct a few hours after he met with them and refused to withdraw a grievance. (*Id.*)

The Prison Litigation Reform Act ("PLRA") mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions. 42 U.S.C. § 1997e(a). Failure to exhaust is an affirmative defense under the PLRA. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Exhaustion is a "non-jurisdictional prerequisite to an inmate bringing suit" and when raised by a defendant it constitutes a threshold issue to be addressed by the court. *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018).

The court is the factfinder on exhaustion issues and so it may hold an evidentiary hearing to resolve factual disputes pertaining to, and then rule on, the failure-to-exhaust defense as long as it provides the parties with adequate notice. *Hardy v. Shaikh*, 959 F.3d 578, 581 n.1 (3d Cir. 2020); *Paladino v. Newsome*, 885 F.3d 203, 210-11 (3d Cir. 2018); *Small v. Camden County*, 728 F.3d 265, 269-71 (3d Cir. 2013). As the Court of Appeals explained, "[i]f there is a genuine dispute of material fact related to exhaustion, then summary judgment [on that defense] is inappropriate, and a court should provide adequate notice to the parties and hold an evidentiary hearing to resolve those factual disputes, or 'at least provide the parties with an opportunity to submit materials relevant to exhaustion,' before resolving those factual disputes." *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (quoting *Paladino*, 885 F.3d at 211).

Under the circumstances of this case, an evidentiary hearing on Defendants' failure-to-exhaust defense was warranted. Thus, the Court provided the parties with the required notice and then held an evidentiary hearing solely so the Court could decide the exhaustion issue before reaching any of the other asserted bases for summary judgment. These individuals testified at the hearing: Andrews; Kerri Moore, the Assistant Chief Grievance Officer with the DOC Secretary's Office of the Inmate Grievances and Appeals ("SOIGA"); Leslie Bradley, the Corrections

Superintendent's Assistant at SCI Pine Grove; and Andrea Wakefield, the Superintendent's Assistant at SCI Huntingdon.

For the reasons explained below, the Court finds that Andrews met his burden at the evidentiary hearing of showing that the DOC's grievance process was unavailable to him. The Court has thus proceeded to evaluate Defendants' contention that they are entitled to summary judgment on the merits as to each of Andrews' claims.

## II.     Standard of Review

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cnty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992) (internal citation and quotation omitted). Thus, when a moving party bears the burden of proof at trial, the moving party "must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007) (citations omitted). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *Id.* at 238. Because the trial burden "includes the obligation to persuade the factfinder that one's propositions of fact are indeed true...if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id.*

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted).

Finally, as explained above, the court is the finder of fact regarding the defense that a plaintiff failed to exhaust available administrative remedies as required by PLRA. Therefore, the

court may hold an evidentiary hearing to resolve factual disputes and decide the threshold issue of whether a plaintiff's claims are procedurally defaulted for failure to exhaust, which is what the Court did here. *Hardy*, 959 F.3d at 581 n.1; *Paladino*, 885 F.3d at 210-11; *Small*, 728 F.3d at 269-71.

## III.     Discussion

### A.     Failure-to-Exhaust Defense

The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Courts are not given discretion to decide whether exhaustion should be excused, *id.* at 639-41, and there is no exception to the exhaustion requirement based on "futility." *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained, it also means that failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default. *Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004). That is because "the PLRA's exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93; *Spruill*, 372 F.3d. at 227-30.

The prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31 ("prison grievance procedures supply the yardstick for measuring procedural default."). Therefore, the procedural requirements for exhaustion in each case "are drawn from the policies of the prison in question rather than from any

free-standing federal law." *Shifflett v. Korszniak,* 934 F.3d 356, 364 (3d Cir. 2019) (citing *Spruill,* 372 F.3d at 231).

The DOC has an official Inmate Grievance System that governs the grievance and appeals process in Pennsylvania correctional institutions. *See* 37 Pa. Code § 93.9. The Inmate Grievance System is set forth in DC-ADM 804. (Defs' Ex. K, ECF 175-11 at pp. 2-36.)

In relevant part, DC-ADM 804 requires an inmate to present a grievance to the Facility Grievance Coordinator for initial review within 15 working days after the event on which the claim being grieved is based. (*Id.* at p. 6.) In the text of the grievance the inmate must, among other things, "request the specific relief sought," including "compensation or other relief normally available from a court," and must also "identify individuals directly involved in the events" complained about. (*Id.*)

If the inmate is not satisfied with the response he or she receives to this grievance, the inmate must appeal to the Facility Manager. (*Id.* at pp. 8, 16.) The Facility Manager must notify the inmate of the disposition of the appeal with 15 working days of receiving the appeal. (*Id.* at p. 17.) If the inmate receives an adverse response from the Facility Manager, the inmate then must appeal to SOIGA, the final level of review. (*Id.* at pp. 19-22.)

Defendants have the initial burden of proving that the plaintiff failed to resort to the DOC's "on-the-books" administrative remedies. *West*, 787 F. App'x at 814; *Rinaldi*, 904 F.3d at 268. If they satisfy this burden, the burden then shifts to the plaintiff, who "bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him[.]" *Id.* (citing *Rinaldi*, 904 F.3d at 268).

At the evidentiary hearing, Defendants introduced what they maintain are all relevant grievances[5] submitted by Andrews. (Defs' Exs. A-I, attached to ECF 175.) Of particular relevance are:

- Grievances A and B, related to the claims Andrews brings against Pelus, Behr and Reid for failing to protect him from Nelson's assault. In these grievances, dated November 18, 2017, Andrews identified Behr and Reid (by his position as a sergeant) as being involved in the incident. Andrews did not identify Pelus by either name or position.

- Grievance D, related to Andrews' retaliation claim against Heide. This grievance is dated January 11, 2018. In it, Andrews complains about Heide's notice to him that the OPM denied his transfer petition.

- Grievance H, related to the retaliation claims Andrews brings against Sheeder and Lipenfield. This grievance is dated February 13, 2018. Andrews asserts in it that Sheeder subjected him to retaliation because Andrews refused to withdraw an earlier-filed grievance (Grievance D). Andrews does not mention Lipenfield in this grievance.

- Grievance I, related to the denial-of-medical-treatment claim Andrews brings against Price. This grievance was submitted by Andrews when he was at SCI Huntingdon. In it, he challenges Price's alleged decision to denied him a CT scan and an MRI allegedly ordered by PA Barbara Buckley and/or Dr. Delbianco.

Defendants have established that Andrews did not properly exhaust his administrative remedies for each of his claims for one or more of these reasons. First, Andrews did not request monetary relief in any grievance. *See, e.g.*, *Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018) (affirming the district court's grant of summary judgment for defendant on plaintiff's excessive force claim because plaintiff failed to request monetary relief in his initial grievance) (citing *Spruill*, 372 F.3d at 233-35); *Taylor v. Chesmer*, No. 2:18-cv-1579, 2020 WL 5366055 (W.D. Pa. 2020) (plaintiff's claims for monetary relief barred because he did not request that relief in his

---

[5] For ease of reference, the Court refers to the grievances by the exhibit letter assigned to them by Defendants.

grievance). Second, aside from Grievance D, Andrews either did not appeal the grievance at all or his appeal was rejected by SOIGA for his failure to comply with the proper procedure laid out in DC-ADM 804. Third, Andrews did not identify Pelus and Lipenfield in the grievances introduced at the hearing that pertained to the claims Andrews asserts against them.

Thus, Defendants have satisfied their burden of proving that, with respect to each of Andrews' claims, he failed to exhaust the DOC's on-the-book administrative remedies for one or more reasons. Andrews did not dispute this at the hearing. Instead, he countered that the DOC's administrative remedies were unavailable to him during the relevant period and for this reason, the Court must reject Defendants' failure-to-exhaust defense.

The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). It also explained that one way an administrative remedy, although officially on the books, is not "available" is "when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 578 U.S. at 644). The Court of Appeals also has held "that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett*, 934 F.3d at 365. Absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any special circumstances." *Ross*, 578 U.S. at 639.

Andrews was housed in SCI Pine Grove's RHU when he filed the grievances related to his claims against Pelus, Behr and Reid (Grievances A and B), Heide (Grievance D) and Sheeder and Lipenfield (Grievance H). (Defs' Ex. L, ECF 175-12 at p. 2.) Andrews testified at the hearing that

when he was housed at SCI Pine Grove's RHU he had no access to DC-ADM 804 and his requests for copies of it were ignored. Thus, Andrews maintains, the grievance policy was literally not available for him to review so that he could properly comply with its rules and procedures regarding what information must be included in an initial grievance and how to properly appeal an adverse response through final review.

Andrews' testimony is corroborated by an inmate request he submitted to Heide and another staff member on December 4, 2017. (Pl's Ex. at ECF 186-4 at p. 2.) In it, Andrews wrote: "Can you please send me a copy of DC-ADM 804 policy forms for purposes of understanding proper exhaustion?" (*Id.*) Andrews testified that this request was denied, as were others he maintains he submitted like it in which he asked for "a complete copy of policy DC ADM 804." (*See id.* at pp. 3-4.)

Heide responded to Andrews' December 4, 2017 inmate request by writing "so noted" in the response section of the form. (*Id.* at p. 2.) Defendants did not introduce testimony from Heide or any other evidence to explain what her response meant. Nor did they introduce evidence to show that anyone provided Andrews with a copy of DC-ADM 804 when he was housed in the RHU, or that the policy was available to all inmates housed there in a common area, such as the RHU law library or its hallways.

Although Leslie Bradley testified that DC-ADM 804 "should be" available in the libraries at SCI Pine Grove, she did not specify that a copy of the policy was available in the RHU's library when Andrews was housed there. Andrews testified that the RHU library did not have a copy of the policy, which is why he resorted to submitting (unsuccessful) inmate requests to attempt to get a copy of it.

Bradley also testified that SCI Pine Grove's inmate handbook contains an outline of some of DC-ADM 804's procedures, including the three-step appeal process. At the same time, Bradley could not recall whether the handbook explained the information that must be included in the initial grievance, such as the request for compensation or the identity of the individuals involved in the incident being grieved. Given her failure to recollect exactly what information is contained in the handbook, and the fact that Defendants did not introduce the handbook into evidence, the Court will not speculate about the handbook's contents.

The Court adds that the DOC's grievance form itself instructs inmates to "refer to the DC-ADM-804 for procedures on the inmate grievance system." (*See*, *e.g.*, Defs' Ex. A, ECF 175-1 p. 4.) The form does not notify inmates that they must identify in the initial grievance all individuals directly involved in the events being grieved or request monetary relief if that is the type of relief they are seeking.

For all these reasons, the Court finds that Andrews' hearing testimony is credible. The Court further concludes that Andrews has satisfied his burden of proving that the DOC's grievance policy was unavailable to him when he was housed in SCI Pine Grove's RHU. Thus, the Court rejects Defendants' failure-to-exhaust defense for Andrews' claims against Pelus, Behr, Reid, Heide, Sheeder and Lipenfield.

The only remaining claim is the one Andrews brings against Price, which is based on alleged events that occurred when was housed at SCI Huntingdon. The relevant grievance for this claim is Grievance I, in which Andrews complained of Price's alleged decision to deny him a CT scan and an MRI ordered by PA Buckley and Dr. Delbianco. (Defs' Ex. I, ECF 175-9 at p. 3.)

At the hearing, Andrews established that he appealed the rejection of this grievance to the Facility Manager on April 8, 2020. (*Id.* at p. 3.) The Facility Manager did not issue his response

12

until May 6, 2020. (*Id.* at p. 2.) Thus, this response was issued well outside the 15-day limit set forth in DC-ADM 804 in which the Facility Manager must notify the inmate of the disposition of the appeal.

Defendants submitted no evidence that the Facility Manager had been given an extension to issue his response. Nor did Defendants otherwise respond to Andrews' argument that the Facility Manager's response was untimely under DC-ADM 804. Thus, the Court finds that Andrews has satisfied his burden of establishing that the grievance process was also unavailable to him with respect to the claim he brings against Price. That is because, as previously explained, the law in the Third Circuit is that "as soon as a prison fails to respond to a properly submitted…appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett*, 934 F.3d at 365.

In conclusion, based on all the evidence presented at the hearing and for the reasons discussed above, the Court finds that Andrews has met his burden of showing that the DOC's grievance process was unavailable to him with respect to all claims. Thus, the Court rejects Defendants' failure-to-exhaust affirmative defense and will now proceed to evaluate Defendants' contention that they are entitled to summary judgment on the merits as to each of Andrews' claims.

### B.     Relevant Factual Background[6]

#### 1.   The November 18, 2017 assault and the events that preceded it

On October 23, 2017, Andrews and Nelson became cellmates in the general population at SCI Pine Grove. (Defs' CSMF ¶ 58, ECF 174 at p. 8.) Nelson's misconduct history reflects that before the incident at issue, "[he] was involved in one…fight with another inmate in April 2017 at SCI Pine Grove." (Pl's Ex at ECF 170-2 at p. 5.)

Andrews asserts that after a few days "he started experiencing extreme difficulties living with…Nelson." (Amend. Compl., ECF 74 at p. 3.) Nelson, Andrews asserts, exhibited "aggressive behavior … or [had] the alpha male complex." (*Id.*) Sometime in October 2017 Andrews spoke to Pelus about "the need for a cell change due to difficulties living in the cell with [Nelson]." (Pl's Aff., ECF 158 at p. 1.) Andrews claims that Pelus did nothing to resolve the problem. (*Id.*)

Also in October 2017, Andrews submitted two cell agreements to his unit manager, Behr, requesting that Andrews be housed with another inmate (Kenyatta Johnson). (*Id.*) Andrews maintains that he "explained the need to move in another cell [away] from…Nelson." (*Id.*) He

---

[6] The factual background discussed here is taken from Defendants' concise statement of material facts (ECF 174), Andrews' response and counter statement of facts (ECF 186), and the exhibits submitted by the parties. (ECF 170, ECF 175, ECF 186.) Additionally, in determining whether genuine issues of material fact exist, the Court also considered the Amended Complaint (ECF 74), Andrews' affidavit at ECF 158 (which he also submitted at ECF 186-10), and his brief at ECF 170 because Andrews signed each of these documents under penalty of perjury and/or had them notarized. *See, e.g.*, *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (although a party may not rest on his or her pleadings to create a fact issue sufficient to survive summary judgment, allegations that are based on personal knowledge and which are in a verified complaint may be used to oppose a motion for summary judgment because the complaint can be treated as an affidavit or declaration). The Court has therefore considered the factual assertions Andrews made in these documents to the extent that they are based on Andrews' personal knowledge and set out facts that would be admissible in evidence, and Andrews is competent to testify on the matters stated. *See* Rule 56(c)(4).

avers that he also spoke with Behr about the threat posed to him by Nelson and "the need to move[,]" and that Behr told him to "be patient." (*Id.*; *see also* ECF 170 at p. 2.)

Andrews' problems with Nelson continued into November 2017. Early that month, Andrews avers, he had "another disagreement" with Nelson when he (Nelson) became agitated after learning that his state-court appeal had been denied. (Amend. Compl., ECF 74 at p. 3.) "Nelson…began taking things out on [Andrews], bullying and harassing [him]." (*Id.* at p. 4.)

Andrews spoke with CO Brandon, who is not a defendant, and told her that he "was having problems with" Nelson. (Pl's Aff., ECF 158 at p. 1.) Andrews also told Brandon that he twice submitted cell agreements which were not honored. According to Andrews, Brandon offered to submit another cell agreement to Behr for him. Andrews maintains that Brandon "pick[ed] up the cell agreement to submit the form personally." (*Id.*) The record does not indicate if Brandon in fact delivered this cell agreement request.

On November 16, 2017, Andrews and Nelson had what Andrews describes as a "minor disagreement within [their] cell during 1600 hours head count." (*Id.* at p. 2.) Later that same day, Andrews spoke to Reid "about the threats of harm made" to him by Nelson. (*Id.*) Andrews maintains that he made it clear to Reid that he feared for his safety, and he requested an "emergency cell move[,]" which was denied. (ECF 170 at p. 3.) Andrews asserts that Reid told him "there were no cells to move [Andrews] or inmate Nelson into." (Amend. Compl., ECF 74 at p. 4.)

According to Andrews, Reid also "called inmate Nelson into his office to investigate the problem." (*Id.*) After this meeting, Reid spoke with Andrews and Nelson together and told them to "try and get along until unit manager Behr returned from his vacation so that[ ] he could do possible cell movements and or honor [Andrews'] cell agreement with [Kenyatta Johnson]." (*Id.*; *see also* Pl's Aff., ECF 158 at p. 2.)

15

The incident between Andrews and Nelson occurred on November 18, 2017.[7] (Defs' CSMF ¶ 59 at p. 8.) Andrews asserts that "Nelson expressed his agitation about [Andrews] going to Sgt. Reid" and then "violently attacked and assaulted" him. (Amend. Compl., ECF 74 at p. 4; *see also* Pl's Aff., ECF 158 at 2.)

Following the incident, Andrews was taken to the medical department for an evaluation. The nurses' notes for an evaluation conducted at 6:35 p.m. on November 18, 2017 reflect that Andrews reported that about three hours earlier "he was physically assaulted by [his] cellmate," who punched him on his left ribcage and the left side of his face. (Defs' Ex. N, ECF 175-14 at p. 3.) The nurse observed no bruising or discoloration to those areas of Andrews' body. She also wrote in her notes that there was "no active bleeding inside the mouth." (*Id.*) The nurse recorded that the "only visible 'injury' is a small area inside [Andrews'] mouth, looks like as if he bit it." (*Id.*)

Andrews' medical records indicate that throughout the year following the November 18, 2017 incident, he continued to report during medical visits that he was experiencing pain and other discomfort as a result Nelson's attack. (Pl's Ex. at ECF 186-7 at pp. 2-16.)

2. Andrews' placement in the RHU following the November 18, 2017 incident

Andrews and Nelson were both moved to the RHU following the incident between them. (Defs' CSMF ¶ 59, ECF 174 at p. 8; Defs' Ex. L at p. 175-12 at p. 2.) Andrews was notified that

---

[7] Andrews initially maintained that the incident occurred on November 17, 2017. (Amend. Compl., ECF 74 at p. 4.) However, Andrews did not deny Defendants' factual assertion that the altercation between he and Nelson occurred on November 18, 2017. (Defs' CSMF ¶ 59 at p. 8; ECF 186, ¶ 59 at p. 4.) Andrews' medical records and his cell history report also indicate that the incident occurred on November 18, 2017. (Defs' Ex. N, ECF 175-14 at p. 3; Defs' Ex. L, ECF 152-12 at p. 2.) In any event, whether the incident occurred on November 17th or 18th is not relevant to the Court's disposition of the Defendants' summary judgment motion.

under DC-ADM 802, Section 1. B.1.f, he was "under investigation for a violation of facility rules," and was placed in "AC pending review by the security office."[8] (Defs' Ex. O, ECF 175-15 at p. 2.)

On November 21, 2017, Andrews had a PRC review regarding the incident and the rationale for his continued confinement in the RHU on AC status. (*Id.* at p. 3.) The written summary of this hearing is as follows:

> [Andrews] has been charged with, or is under investigation for[,] a violation of facility rules, and there is a need for increased control pending disposition of charges or completion of investigation. Inmate was advised of his status. Continue AC status pending outcome of investigation due to PRC by 12-02-17. Inmate Andrews stated that Security did meet with him and are aware of his issues. [Andrews] was having a hard time understanding his status, etc. PRC explained his status and privileges in depth. [Andrews] stated that his cell mate (Nelson) assaulted him and he is in fear of his life.

(*Id.*)

On November 30, 2017, in response to an inmate request in which Andrews asked if the security investigation had been completed and whether a transfer petition had been submitted on his behalf, Heide wrote: "A recommendation was made by the security office. This is [the first] step in [the] process. It was received today! It has not been decided that you will be transferred, only recommended." (Pl's Ex. at ECF 170-3 at p. 17.)

Defendants have produced a one-page document that lists the dates on which Andrews had his PRC reviews from November 28, 2017 through January 16, 2018. (Defs' Ex. O, ECF 175-15 at p. 4.) This document contains brief, one-line summaries of Andrews' status following each meeting. It shows that in December 2017, Andrews remained housed in the RHU on AC status

---

[8] This section of DC-ADM 802 provides, that "[a] general population inmate may be assigned AC status and placed in a Security Level (5) Housing Unit…for the following reasons: … the inmate has been charged with, or is under investigation for a violation of facility rules, and there is a need for increased control pending disposition of the charges or completion of the investigation." (Pl's Ex. at ECF 170-3 at pp. 2-3.)

while an administrative/separation transfer petition was being considered by the OPM. (*Id.*) Defendants have also produced a two-page, heavily redacted copy of DOC's records pertaining to Andrews' administrative/separation transfer petition. (Defs' Ex. P, ECF 175-16 at pp. 1-2.) It reflects that on December 20, 2017, James M. Walsh (who is not a defendant), entered a notation that Andrews' transfer petition was "under review by OPM[,]" which was "[a]waiting Info[rmation]." (*Id.* at p. 3.)

### 3. After Andrews complained about his lack of privileges, Heide informs him that the OPM has denied him a transfer

In December 2017, Andrews submitted inmate requests to Heide and another member of the PRC in which he complained about his lack of phone privileges and a television while housed in the RHU on AC status. (Pl's Ex. at ECF 170-3 at p. 15; Defs' Ex. C, ECF 175-3 at p. 9.) A staff member responded to one of Andrews' requests by explaining to him that any request for a television "must be granted by PRC." (Defs' Ex. C, ECF 175-3 at p. 9.)

On January 2, 2018, Andrews submitted an inmate request to Heide in which he wrote:

Can you please give me copies of information and progress on my transfer status?? And can I please have all the information on and about the facts on DC-ADM 802?? If possible, can you tell me what region will I be transferring too [sic]?? I spoke to Ms. Delosh my counselor and she told me that my progress is complete and I am just waiting on bed space and bus ride.

(Pl's Ex. at ECF 170-3 at p. 14.)

On January 5, 2018, Andrews filed Grievance C in which he complained about his limited privileges while housed in the "RHU on AC status pending a separation transfer…like [not] having a television in my cell." (Defs' Ex. C, ECF 175-3 at p. 3.) Andrews asked why he was "being subjected to punitive sanctions and/or limited privileges when I've done nothing thing wrong to be in here[?]" (*Id.*)

18

On the same date that Andrews filed this grievance, Heide responded to his January 2, 2018, inmate request and informed him that his transfer petition "was denied by OPM. We will review for an AC swap." (Pl's Ex. at ECF 170-3 at p. 14.) The PRC's notes for its review of Andrews in January 2018 also reflect that he remained in "AC status pending transfer consideration/swap." (Defs' Ex. O, ECF 175-15 at p. 4.)

On January 11, 2018, Andrews submitted Grievance D in which complained about Heide's notification that the OPM denied his transfer petition. (Defs' Ex. D, ECF 175-4 at p. 3.) Andrews complained about the denial and wrote that he feared for his safety at SCI Pine Grove and that he "refuse[s] to go back out into general population due to the circumstances with the risk of being hurt badly or possibly killed." (*Id.*)

Then, on January 28, 2018, and after the Facility Manager had denied Grievance C (Def's Ex. C, ECF 175-3 at pp. 4), Andrews appealed to SOIGA. In this appeal Andrews once again complained about how long he had been housed in the RHU on AC status. (*Id.* at p. 8.) He specifically complained about PRC staff and claimed that their actions were inconsistent with DC-ADM 802 policy and were punitive. Andrews requested that the PRC be investigated. (*Id.*)

4. The events of February 13, 2018

Sheeder was the staff member assigned to respond to Grievance D. He and Lipenfield met with Andrews on February 13, 2018. At this meeting, Andrews avers, Sheeder tried to get him to withdraw Grievance D and threatened that, if Andrews did not do so, Andrews would stay in the RHU longer. Andrews refused to withdraw Grievance D. (ECF 170 at p. 4; *see also* Pl's Aff., ECF 158 at p. 2.)

Later the same day, Sheeder issued the initial response denying Grievance D. He rejected as false Andrews' assertion that he was being threatened by other inmates because of "lies and

rumors" being spread by staff. (Defs' Ex. D, ECF 175-4 at p. 5.) Sheeder also wrote: "You are in

the RHU on AC status because you told staff you were assaulted by Inmate Nelson. When and if

you are transferred will be decided *by PRC and OPM*." (*Id.*) (emphasis added.)

In Sheeder's response to Andrews' interrogatories, Sheeder stated that he does not

remember Andrews and has no recollection of whether he tried to get Andrews to withdraw

Grievance D. (Pl's Ex. at ECF 186-5 at pp. 5-6.) During the grievance process, Andrews was

advised that Sheeder acknowledged that he had asked Andrews to withdraw his grievance but said

he only did so because he (Sheeder) was helping Andrews resolve his issue and obtain a transfer.

Andrews also was advised that after an investigation of his grievance, it had been determined that

there was no evidence that Sheeder had threatened Andrews. (Defs' Ex. H, ECF 175-8 at p. 4.)

Andrews returned to his cell after his meeting with Sheeder and Lipenfield. Around four

hours later, two corrections officers came to Andrews' cell and ordered him to accept a cellmate

(Inmate Wallick). (Pl's Aff., ECF 158 at p. 2.) Andrews explains that he refused this order because

he feared another inmate would harm him since there were rumors going around the prison that he

was a snitch. (*Id.*; Amend. Compl., ECF 74 at pp. 5-6.)

Lipenfield ordered that Andrews be issued a misconduct for refusing to accept a cellmate.

(*Id.*) In this misconduct, Andrews was charged with refusing to obey an order (to accept a

cellmate), threatening another person, and using abusive or obscene language. (Pl's Ex. at ECF

186-10 at p. 9.)

In Andrews' statement to the misconduct hearing examiner, Andrews denied threatening

anyone or using obscene language. (*Id.* at pp. 10-12.) He admitted that he refused to accept the

cellmate but explained that he did so because he had been assaulted by a former cellmate (Nelson)

and "there was threats out in population of serious bodily injury so I fear for my safety until I am

20

transferred as planned…. I also feel as if this is retaliation from Captin [sic] Sheeder for me not

wanting to withdraw [Grievance D] earlier today." (*Id.* at p. 11.)

The hearing examiner found Andrews guilty of committing the misconduct of refusing to

obey an order but dismissed the other two charges. (*Id.* at p. 12.) Andrews was sanctioned to 30

days in disciplinary custody. (*Id.* at p. 12.) Following an appeal, the sanction was reduced to 15-

day in disciplinary custody because Andrews' Unit Team had given him a favorable

recommendation, it was Andrews' first misconduct, and he "normally [was] a model inmate on

the housing unit." (*Id.* at p. 14.)

In the meantime, Andrews also met with the PRC on February 13, 2018, and he has

produced records for this review. (Pl's Ex. at ECF 170-3 at p. 5.) The written summary of it is as

follows:

> PRC reviewed inmate Andrews on 02-13-2018. PRC informed [him] of their
> decision to Continue AC status pending swap consideration. PRC approves long-
> term commissary and one weekly phone call. Inmate Andrews inquired about
> whether there is another institution for him to go to yet. PRC explained that a swap
> has to be a mutual agreement between institutions. Inmate Andrews insists that his
> safety is at risk to be in population…Inmate's request for a TV was denied. Inmate
> asked if he could get something in writing regarding his transfer being denied. He
> states that a letter he received from Lt. Walsh contradicts the information that his
> transfer was denied. The inmate wants a copy of his transfer petition so that he can
> see who and why it was denied. PRC explained they could not provide a copy of
> the transfer [petition]. Inmate Andrews does not understand how his transfer could
> possibly be denied with his circumstances. Inmate states that he just wants proof
> that OPM denied the transfer. Inmate explained how he previously wrote to OPM
> and the Mayor of Philadelphia in order to get a transfer. PRC explained the process
> and who has control over whether a transfer occurs or not.

(*Id.*) At the end of this review, Andrews was advised that his next PRC review was scheduled for

May 15, 2018. (*Id.*)

Andrews remained in the RHU in AC status until he was transferred to SCI Huntingdon on February 28, 2018. (Defs' CSMF, ¶ 66, ECF 174 at p. 9; Defs' Ex. L, ECF 175-12 at p. 2; Defs' Ex. P, ECF 175-16 at p. 2.)

### 5. Andrews requests a CT scan and an MRI

On August 24, 2018, Andrews was a "no show sick call" at SCI Huntingdon. (Defs' CSMF, ¶ 68; Defs' Ex. Q, ECF 175-17 at p. 5.) On August 27th and 28th of that same month, Andrews was seen by medical staff. He reported that he was still experiencing injuries to his "neck, thoracic and lumbar spine." (Defs' Ex. Q, ECF 175-17 at p. 2.) PA Buckley recorded in her notes for Andrews' August 28th visit that all of his X-rays were normal. (*Id.*) She also wrote: "*Patient is requesting* CT or MRI to be done." (*Id.*, emphasis added.)

When Andrews was housed at SCI Huntingdon, he was prescribed pain medication and regular physical therapy. (Defs' CSMF, ¶¶ 70-73; Defs' Ex. Q, ECF 175-17 at pp. 2-5; Pl's Ex. at 186-7 at pp. 2-14.) There is no evidence that PA Buckley, Dr. Delbianco, or anyone else on the medical staff at SCI Huntingdon, ordered that Andrews have a CT scan or an MRI.

### C.   Andrews' Claims

Andrews brings his constitutional tort claims against each defendant under 42 U.S.C. § 1983, which "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). Only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983. Thus, each defendant in this civil action can be held liable only for his or her own conduct. *See, e.g.*, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged

constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

### 1.  Failure-to-Protect claims against Pelus, Behr and Reid

"[P]rison officials have a duty…to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotations and citation omitted). Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

To prove an Eighth Amendment failure-to-protect claim, a plaintiff must "show: (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (abrogated on other grounds by *Bistrian v. Levi*, 912 F.3d 79, 84 (3d Cir. 2018)) (citing *Farmer*, 511 U.S. at 834) and *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997)).

The first (or objective) prong of this test requires that the plaintiff show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *Shelton v. Bledsoe*, 775 F.3d 554, 564-65 (3d Cir. 2015) (emphasizing that "the Eighth Amendment…protects against the risk—not merely the manifestation—of harm.") The second prong, "deliberate indifference," is a subjective standard. The plaintiff must show subjective recklessness on the defendant's part. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. In sum, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by filing to take reasonable measures to abate it." *Id.* at 847.

"Deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). That said, as the Court of Appeals has stated, "using circumstantial evidence to prove deliberate indifference requires more than evidence that the defendants should have recognized the excessive risk and responded to it; it requires evidence that the defendant must have recognized the excessive risk and ignored it." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 138 (3d Cir. 2001).

Defendants contend that Andrews has failed to adduce evidence that he was incarcerated under conditions that posed a substantial risk of harm, or that Pelus, Behr and Reid knew of and disregarded an excessive risk to his wellbeing posed to him by Nelson. The Court agrees.

Viewing the evidence in the light most favorable to Andrews, he spoke to Pelus once shortly after he became cellmates with Nelson. During this conversation, Andrews told Pelus that he needed a cell change "due to difficulties living in the cell with [Nelson]." (Pl's Aff., ECF 158 at p. 1.) No reasonable jury could conclude that this single conversation in which Andrews complained generally to Pelus about the difficulties of sharing a cell with Nelson meets either the

objective or subjective element of a failure-to-protect claim. *See, e.g.*, *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014) (plaintiff's statement to defendant that he was not "getting along" and did not "feel comfortable" with his cellmate was not sufficient evidence from which a jury could find deliberate indifference).

As for Behr, taking Andrews' averments as true, the facts are as follows. Nelson was involved in one other fight with an inmate in April 2017. (Pl's Ex. at ECF 170-2 at p. 5.) After he and Andrews became cellmates in October 2017, Andrews submitted two cell agreements requesting to be housed with another inmate that Behr never honored. Andrews also spoke with Behr about the threat posed to him by Nelson and "the need to move[,]" and Behr told him to "be patient." (Pl's Aff., ECF 158 at p. 1; *see also* ECF 170 at p. 2.)

Andrews' statements to Behr that he felt Nelson was a threat to him and that he wanted a new cellmate are not sufficient evidence to permit a reasonable jury to infer that Behr knew of and intentionally disregarded an excessive risk to Andrews' safety. *See, e.g.*, *Wise v. Ranck*, 340 F. App'x 765, 766 (3d Cir. 2009) (citing with approval *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998) (threats between inmates are common and do not always serve to impute actual knowledge of a substantial risk of harm)). Moreover, the fact that Nelson was also involved in one prior fight with an inmate in April 2017 is not evidence from which a reasonable jury could conclude that Behr, assuming he was aware of Nelson's misconduct history as his unit manager, must have recognized the excessive risk Nelson posed to Andrews and yet ignored that risk. *See, e.g.*, *Farmer*, 511 U.S. at 842-43 (if the "plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence

could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (internal quotation and citation omitted).

Finally, under Andrews' version of events, he spoke with Reid on November 16, 2017, after he and Nelson had a "minor disagreement within their cell" that day. (Pl's Aff., ECF 158 at p. 2.) Andrews told Reid "about the threats of harm made" to him by Nelson and said he feared for his safety. (*Id.*) Reid denied Andrews' request for an emergency cell move, telling him there were no open cells available to accommodate the move. Reid then met with Nelson and Andrew together and told them to try to get along until Behr returned from vacation and he (Behr) could consider possible cell moves. (*Id.*; Amend. Compl, ECF 74 at p. 4; ECF 170 at p. 3.)

When viewing the evidence in the light most favorable to Andrews, the Court concludes that he has failed to adduce evidence from which a reasonable jury could conclude that Reid knew of and disregarded an excessive risk to his safety. Soon after Andrews told Reid that Nelson threatened him, Reid met with both of them and attempted to alleviate the problems between them until Behr returned to work and could evaluate whether a cell change could or would be made. Reid's meeting with Nelson and Andrews may have angered Nelson because he attacked Andrews soon after. Yet Andrews does not claim that during their meeting Nelson exhibited aggressive or threatening behavior towards him or otherwise acted in a manner that would have put Reid on alert that the two inmates needed to be immediately separated.

Andrews also maintains that Reid failed to follow the policy set forth in DC-ADM 802 (the DOC's AC procedural manual). (ECF 170 at p. 3.) Andrews asserts that under the circumstances Reid should have arranged for Andrews to be taken out of the general population and temporarily placed in the RHU on AC status pending a security investigation into the threat posed to him by Nelson. (*Id.*; see also Pl's Ex. at ECF 170-3 at pp. 2-3.) But to prevail on any constitutional claims,

26

Andrews must do more than establish that a defendant violated DOC policy. *See, e.g.*, *Jordan v. Rowley*, No. 1:16-cv-1261, 2017 WL 2813294, at *2 (M.D. Pa. June 29, 2017) ("a violation of an internal prison policy does not automatically rise to the level of a constitutional violation. A prison policy manual does not have the force of law and does not rise to the level of a constitutional violation.") (internal quotations and citation omitted). Thus, evidence that Reid may not have followed DOC policy is not evidence by itself from which a reasonable finder of fact could conclude that he violated Andrews' Eighth Amendment rights.

For all these reasons, the Court will grant Defendants' motion as it pertains to the Eighth Amendment failure-to-protect claim asserted against Pelus, Behr and Reid.

### 2.  Retaliation claims against Heide, Sheeder and Lipenfield

To succeed on a claim of retaliation, a plaintiff bears the burden of proving three things. First, that he was engaged in constitutionally protected activity, such as filing a grievance. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Fantone v. Lantini*, 780 F.3d 184, 192 n.8 (3d Cir. 2015). Second, a plaintiff "must show that he suffered some 'adverse action' at the hands of the prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Circ. 2000)). A plaintiff "satisfies this requirement by demonstrating that the action 'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" *Id.* (quoting *Allah*, 229 F.3d at 225). Third, the plaintiff has the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to take that adverse action. *Id.* (citing *Mt. Healthy*

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).[9]

If a plaintiff meets this prima facie case, the burden at trial then shifts to the defendant to prove that he or she would have taken the same challenged action even in the absence of the protected activity. "This means that, once a plaintiff demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 333-34 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287, and incorporating the balancing test announced in *Turner v. Safley*, 482 U.S. 78, 89 (1987) into this burden-shifting framework for prisoner-plaintiffs). *See also Mays v. Springborn*, 719 F.3d 631, 634-35 (7th Cir. 2013).

Defendants do not assert that Andrews cannot establish a prima facie case on any of his retaliation claims. (ECF 173 at pp. 8-10.) Rather, they assume that Andrews can establish a prima facie case but argue that Heide, Sheeder and Lipenfield would have engaged in the same challenged action absent Andrews' protected activity (the filing of a grievance and/or the refusal to withdraw a grievance). (*Id.* at p. 10-1.)

Defendants' argument is not persuasive. As explained above, once Andrews establishes a prima facie case of retaliation, the burden at trial shifts to Defendants to prove that they would have taken the same challenged action even in the absence of Andrews' protected activity. *Rauser*, 241 F.3d at 333. But here Defendants have failed to direct the Court to evidence in the summary

---

[9] As discussed above, because Andrews is bringing his retaliation claims under § 1983, he must also show each defendant's personal involvement in the retaliation. Defendants do not argue that no reasonable jury could conclude that Heide, Sheeder or Lipenfield lacked personal involvement in the retaliatory acts Andrews asserts they committed.

judgment record from which a reasonable jury could determine that Heide, Sheeder and Lipenfield would have subjected Andrews to the same adverse actions absent Andrews' protected conduct. *Id.* at 334 (reversing the grant of summary judgment for the defendants because they "offered no evidence to suggest [their adverse] actions were taken for any other reason, penologically legitimate or otherwise.").

For example, with respect to Andrews' claim against Heide, all that can be gleaned from the record is that on the same day (January 5, 2018) that Andrews filed a grievance (Grievance C) complaining about his lack of privileges in the RHU, Heide, who was a member of the PRC and thus had involvement in the decisions about his privileges as well as his transfer, informed him that the OPM had denied his transfer petition. (Defs' Ex. C, ECF 175-3 at p. 3; Pl's Ex. at ECF 170-3 at p. 14.) Defendants do not direct the Court to evidence that shows the date the OPM first denied Andrews' transfer petition or why it was denied. Nor do they explain why the OPM eventually approved his transfer on or around February 28, 2018.

Rather, Defendants simply state that Andrews "remained in the RHU while PRC considered and was able to facilitate an administrative/separation transfer for [Andrews] to another facility." (Defs' CSMF ¶ 65, ECF 174 at p. 9.) In support, Defendants cite their Exhibit O, which merely contains one-sentence summaries of Andrews' PRC reviews conducted from November 28, 2017 through January 16, 2018. (Defs' Ex. O, ECF 175-15 at p. 4.) Those notations indicate only that from January 2nd to January 16th, Andrews continued to be held in the RHU on AC status while the request for inmate "swap" was being considered. (*Id.*)

As for Andrews' claims against Sheeder and Lipenfield, Andrews contends that just hours after he attended a meeting with these two defendants and refused to withdraw a grievance, they subjected him to retaliation by arranging to have another inmate from the general population placed

into his cell in the RHU. Their actions put Andrews in the position where he could either accept the cellmate and the risk to his personal safety that this entailed, or he could refuse the placement and deal with the consequences of receiving a misconduct. Faced with this dilemma, Andrews chose the latter option and received a misconduct for refusing to accept the cellmate and for two other reasons that a hearing examiner later found him not guilty of committing (threatening another person and using abusive language). (Pl's Ex. at ECF 186-10 at pp. 9-13.) As the Court previously explained, under these circumstances, a factfinder could reasonably conclude that Sheeder and Lipenfield engineered a scenario in which a misconduct was inevitable. (ECF 138 at pp. 4-6.)

Defendants have not produced any competing evidence on Andrews' claims against Sheeder and Lipenfield. In Defendants' statement of material facts, they do not discuss Andrews' misconduct, the events that prompted it, or the outcome of his misconduct proceeding. (ECF 174 at pp. 8-10.) Nor do Defendants address their burden of showing that Sheeder and Lipenfield would have subjected Andrews to the same adverse action (the issuance of the misconduct) even absent Andrews' protected activity of refusing to withdraw a grievance.

In fact, the only argument that Defendants make that specifically relates to Andrews' claim against Sheeder and Lipenfield is that Andrews' "allegations against Defendant Sheeder that he attempted to coerce [him] into withdrawing a grievance were unfounded and the only conversation had between [them] was with regard to his transfer request." (ECF 173 at p. 10.) Andrews asserts otherwise, however. (Pl's Aff., ECF 158 at p. 2; ECF 170 at p. 4.) Thus, there is a genuine issue of material fact on that issue that cannot be resolved by the Court on summary judgment.

For all these reasons, the Court denies Defendants' motion as it pertains to the First Amendment retaliation claims asserted against Heide, Sheeder and Lipenfield.

### 3. Denial-of-medical-care claim against Price

Because inmates "must rely on prison authorities to treat [their] medical needs," the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle, v. Gamble*, 429 U.S. 97, 103 (1976). Eighth Amendment claims for denial of adequate medical care constitute another subset of claims concerning conditions of confinement. Thus, to prove an Eighth Amendment violation arising from the conditions of confinement, the plaintiff must show that the condition was "sufficiently serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), and also that the defendant was deliberately indifferent to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As explained above, the deliberate indifference element of the Eighth Amendment test is a subjective test. The "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Id.* at 837. *See also Estelle*, 429 U.S. at 107.

In this case, Price is entitled to summary judgment in her favor because the record lacks any evidence that PA Buckley, Dr. Delbianco, or anyone else on the medical staff at SCI Huntingdon, recommended that Andrews have a CT scan or an MRI. Nor is there any evidence that Price denied or interfered with Andrews receiving any medical treatment.

To defeat summary judgment on his claim against Price, it is not enough for Andrews to now generally complain about the medical care he allegedly received while at SCI Huntingdon. (*See* 170 at p. 6.) Andrews' claim against Price is that she denied him a CT scan and an MRI ordered by PA Barbara Buckley and/or Dr. Delbianco, and he has adduced no evidence to support that claim. And, as explained above, under § 1983, Price can only be liable to Andrews for her own actions or inactions. Price is not legally responsible under § 1983 because medical personnel at SCI Huntingdon did not order that he receive a CT scan, an MRI or any other type of treatment.

31

Based on the above, the Court grants Defendants' motion as it pertains to the Eighth Amendment denial-of-medical treatment asserted against Price.

## IV.    Conclusion

For these reasons, the Court will deny in part and grant in Defendants' Motion for Summary Judgment. (ECF 172.) Specifically, after a full hearing and consideration of all the evidence, the Court will deny the Motion as to Defendants' affirmative defense of failure to exhaust. The Court will also deny Defendants' Motion as to the retaliation claims asserted against Heide, Sheeder and Lipenfield. The Court will grant the Motion in favor of Defendants as to all claims asserted Pelus, Behr, Reid and Price and will terminate them as defendants in this lawsuit.

An appropriate Order follows.

Dated: December 20, 2023                    BY THE COURT:

                                            /s/ Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            UNITED STATES MAGISTRATE JUDGE